UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ZAPATA RIVERA, | ) | |
| Plaintiff, | ) | Civil Action |
| v. | ) | No. 4:26-cv-40061-MRG |
| WESLING ET AL, | ) | Pages 1 to 32 |
| Defendant. | ) | |

BEFORE THE HONORABLE MARGARET R. GUZMAN
UNITED STATES DISTRICT JUDGE

HEARING

March 19, 2026
11:00 a.m.

Harold D. Donohue Federal Building and U.S. Courthouse
Courtroom No. 2
595 Main Street
Worcester, Massachusetts

Jessica Leonard, CSR, FCRR
Official Court Reporter
United States District Court of Massachusetts
595 Main Street
Worcester, MA 01608
Jessica@wickedsteno.com

APPEARANCES:

On Behalf of the Petitioner:

ACLU OF MASSACHUSETTS
By: Daniel L. McFadden
One Center Plaza
Suite 850
Boston, MA 02108
617-482-3170
Dmcfadden@aclum.org

ACLU OF MASSACHUSETTS
By: Jessie J. Rossman
One Center Plaza
Suite 850
Boston, MA 02108
617-482-3170
Jrossman@aclum.org

ACLU OF MASSACHUSETTS
By: Ingrid Sydenstricker
One Center Plaza
Suite 850
Boston, MA 02108
617-482-3170
Isydenstricker@aclum.org

On Behalf of the Respondent:

DOJ-USAO
By: Nicole M. O'Connor
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3266
Nicole.O'Connor@usdoj.gov

**STENOGRAPHER'S NOTE:** All quotations from exhibits or other documents are transcribed as they were read into the record and do not necessarily reflect the exact wording of the original document.

Quotation marks in the transcript are used for readability and stylistic purposes and may not represent a direct quote.

Proceedings reported and produced
by computer-aided stenography.

**P R O C E E D I N G S**

THE CLERK: This is Civil Action No. 4:26-cv-40061, *Carlos Zapata Rivera v. David Wesling et al.* Counsel, would you please note your appearance for the record, beginning with the petitioner?

ATTORNEY McFADDEN: Good morning, Your Honor. Dan McFadden from the ACLU of Massachusetts on behalf of the petitioner, Mr. Zapata, who is present in the gallery with me today.

THE COURT: Thank you.

ATTORNEY ROSSMAN: Good morning, Your Honor. Jessie Rossman.

ATTORNEY SYDENSTRICKER: Ingrid Vianna Sydenstricker.

THE COURT: Thank you and good morning to you all.

ATTORNEY O'CONNOR: Good morning, Your Honor. Nicole O'Connor for respondents.

THE COURT: Good to see you in person.

ATTORNEY O'CONNOR: You as well, Your Honor.

THE COURT: I just wanted to let your client know that he's free to sit at the table, sit behind you. He's also free to sit where he is.

ATTORNEY McFADDEN: Thank you, Your Honor.

THE COURT: Thank you all very much. I appreciate your appearance here.

We are here today on the merits of Mr. Zapata Rivera's

habeas petition. The purpose of this hearing is for the parties to put on their best arguments. And for the Court to ascertain whether it has the information it needs to make a ruling.

As I understand, Petitioner is challenging the imposition of enhanced conditions of release because he argues that these enhanced conditions amount to custody and are motivated by retaliation for protected speech; namely, the filing of a civil rights suit against an unnamed ICE agent.

Let me say that I do not need further argument on whether the petitioner's current conditions amount to the functioning equivalent of custody for the purposes of habeas jurisdiction. I find that they do. And that conclusion is well supported by the case law.

Next, I have some questions to better flesh out our record. After I hear from the parties on these background facts, we'll turn to the First Amendment claim.

Let me ask for the petitioner. Was the order of release on recognizance issued by an immigration judge, or was it an administrative order issued by border patrol? The record is unclear as to what role, if any, an immigration judge has had in the petitioner's case.

ATTORNEY McFADDEN: Yes, Your Honor. So the 2023 order of release was issued by the immigration authorities, not by an immigration judge.

THE COURT: What did it practically look like? Was it someone who was acting on behalf of immigration at the border or in some other location?

ATTORNEY McFADDEN: Our understanding, Your Honor -- and the diversion we received was received via FOIA request, so it has some redactions. But our understanding is it was issued in the Southwest United States when Mr. Zapata Rivera had been initially arrested inside the United States but in that region of the country.

And then he was ordered to report and check in with ICE in Massachusetts when he arrived in Massachusetts, which he did do. And when he checked in with ICE in Massachusetts, at that time they did not require GPS, they did not require ISAP, and they did not require any further check-ins. And that was the status quo for about three years.

THE COURT: Did he ever appear before an immigration judge?

ATTORNEY McFADDEN: Yes, Your Honor. So Mr. Zapata Rivera has an ongoing case in the immigration court, removal case. He has applied for asylum. He's appeared for all required appearances in the immigration court. His next appearance in immigration court is in 2028.

THE COURT: So regarding the initial reaction with the Government upon his entry here after being arrested, did they give him a list of specific conditions that were contemplated

by the original release in any paperwork that he received?

Did he receive anything that said here's the list of things -- and not the immigration judge but the first authorities that he met upon entry to the United States?

ATTORNEY McFADDEN: Yes, Your Honor. There is an order of release that includes certain conditions. As we mentioned in the petition, in 2023 one of the conditions in that initial order was GPS and Alternatives to Detention program. And when he arrived in Massachusetts and checked in with ICE, he was at that time told that they would actually not proceed with GPS, Alternatives to Detention, or further check-ins.

THE COURT: So he had two interactions? The first was: This is a list of conditions.

And then when he checked in with ICE, they indicated they would not be imposing those?

ATTORNEY McFADDEN: Yes, Your Honor. I don't think it's disputed that he was originally released in February of 2023 and was told, "When you get to Massachusetts, check-in with ICE."

The original release included as conditions GPS and Alternatives to Detention, but when he got to Massachusetts, ICE actually did none of those things and he was released without GPS, ISAP, or check-ins for almost three years after that time.

THE COURT: Was providing his social media account information something that was contemplated as part of his original release? Was there any information about that? At his original release?

ATTORNEY McFADDEN: No, Your Honor. I don't believe so. I can check, but I don't believe so.

THE COURT: Are you challenging ICE's authority to set the current conditions of release?

ATTORNEY McFADDEN: Well, yes, Your Honor, because we contend that they are the product of retaliation against our client for engaging in First Amendment-protected petitioning activities.

THE COURT: Is the challenge limited to the manner in which that authority to impose the conditions was exercised?

ATTORNEY McFADDEN: Well, Your Honor, I think -- as we mentioned in our papers, I think it is legally doubtful that they could have simply reimposed these conditions in the absence of any change in circumstance. Which -- there was none. But for purposes of the petition, I think, as we argued, you can assume that even if there was some legal authority in the abstract to impose these conditions, they could not be imposed for the purpose of retaliation, which is what the record shows here.

THE COURT: Why isn't the appropriate remedy here, then, amelioration of the conditions before an immigration

judge?

ATTORNEY McFADDEN: So, Your Honor, that argument from the Government is an argument about exhaustion of administrative remedies. And the Government argues that Mr. Zapata Rivera should be required to exhaust administrative remedies either by going to the immigration judge or to the district director under 8 CFR 1236.1(d).

There are a few reasons why that is not required here. First of all, everybody agrees there is no mandatory exhaustion here. Congress has not created in the immigration context any mandatory exhaustion requirement.

So we are in the realm of discretionary or common law exhaustion where the Court has flexibility to decide whether or not to require exhaustion. And in that realm of discretionary or common law exhaustion, there are well-recognized factors that courts have applied to decline to apply exhaustion.

So one of those is futility, such as when there's substantial doubt about the -- whether or not the agency has authority to hear the claim. And also, there's futility when the agency has been shown to predetermine the issue. And there's also an exception for irreparable harm. When a person is suffering irreparable harm such as loss of liberty, exhaustion is not typically required.

And here, all of these exemptions apply in different ways and indicate that exhaustion should not be required.

First of all, raising a First Amendment retaliation claim in the Immigration Court would be futile because the immigration court is an administrative body within the Department of Justice that applies immigration law. It does not have authority or jurisdiction to hear or adjudicate First Amendment retaliation claims.

The Second Circuit held that twice just last year in the *Ozturk* and in the *Mahdawi* decisions, so even if you went to the immigration court, it is at least highly doubtful there would be any relief for him there in immigration court because the Court simply could not hear the claim.

Additionally, it's very unlikely that the immigration court would find that this regulation, 1236.1, actually applies to him. The reason for that is that's a regulation that applies to people who are subject to 8 U.S.C. 1226, discretionary detention authorities.

And we agree that Mr. Zapata Rivera is subject to 1226 detention authorities. However, right now in the immigration court, as you've probably seen in many of these habeas petitions, people like our client who go to immigration court are not being treated as if they were 1226 detainees. They are being treated as mandatory 1225(b)(2) detainees if they entered the country without admission or parole.

So if Mr. Zapata Rivera went to immigration court and said, "Please apply this amelioration regulation for people in

discretionary attention," probably what the immigration court would rule is, in fact, he's a mandatory detainee to whom that regulation doesn't apply.

So those are two reasons why the immigration court would be very unlikely to hear this claim.

Additionally, it would be futile to raise it with the district director. Keep in mind that at the last check-in in February -- sorry. That's not the most recent check-in -- but the check-in in February, Mr. Zapata Rivera's counsel already did try to take this up the chain of command and asked to speak with the supervisor and was told no, that she would not be permitted to speak to the supervisor. That's in the Rosenbaum declaration. And she was also told that the decision had been made above the supervisor level.

And, of course, the field office director is a respondent in this case, and we have heard no suggestion that ICE is interested in ameliorating or getting rid of these conditions. So it does not seem like there would be any particular point in trying to reengage with ICE on this one when we've already been told no.

And then, lastly, exhaustion should not be required because the restrictions on Mr. Zapata Rivera's liberty are causing irreparable harm. He is required to wear a GPS device attached to his body at all times. It collects information about all of his movements, including to sensitive places like

medical appointments, like appointments with his counsel. And that information is being retained by ICE, and there appear to be no restrictions on ICE using that information.

Additionally, under the conditions of the ISAP program, Mr. Zapata Rivera is being compelled to allow ICE to enter his home on demand at any time without a warrant. And that is a massive Fourth Amendment violation for him as a result of unlawful retaliation, to be required to open his home to Government intrusion.

And there are also numerous other restrictions on his liberty in these conditions, including travel restrictions; he has to check-in; he needs permission from ICE if he wants to move.

And he has to provide vast amounts of personal information, not just the social media. But when he went for his check-in on March 3 -- and this is in the supplemental Rosenbaum declaration -- they asked him about 30 questions about his family, up to and including whether or not his daughter was vaccinated.

It's just a massive intrusion upon him to have to comply with these conditions. And so that is the form of irreparable harm. It's well established that restraints on liberty like that constitute irreparable harm, and that is another exception to discretionary exhaustion.

So for those reasons -- both the futility and the harm

of our client -- exhaustion should not be required here.

THE COURT: Thank you.

All right, Counsel. If the petitioner is challenging his custody on constitutional dimensions, doesn't an exception to the common law administrative exhaustion apply? And I'm citing *Brito v. Garland*. Explicitly, that case acknowledged that exhaustion may not be required if the petitioner is challenging the deprivation of a liberty interest.

ATTORNEY O'CONNOR: No question, Your Honor. That's exactly right. There's certainly no requirement here that Petitioner needs to exhaust.

It's really a practical argument from the Government, Your Honor. I don't think we would necessarily be here if these conditions were enforced back in 2023. Petitioner could have, in theory, seen the immigration judge at that time, and I suggest that that's the course that they probably would have taken.

Here they had that same course of action available to them, and it could have mooted this petition because the relief that they're seeking here, Your Honor, could have been provided by the immigration judge who is given the specific authority to ameliorate conditions of release imposed by DHS. It's what they do.

THE COURT: In this case why, after nearly three years, was the petitioner suddenly subjected to these enhanced

conditions?

ATTORNEY O'CONNOR: So, Petitioner keeps framing this as: no change in circumstance. But I think there's no question here that the change in administration has been a change in priorities since the prior administration, Your Honor, and there has been a significant increase in the enforcement of immigration laws.

This is not a change in the terms of Petitioner's release. This is, perhaps, a change in the enforcement. They weren't enforced in 2023. But these conditions were always part of Mr. Zapata Rivera's conditional release lawfully when he was released on recognizance under 8 U.S.C. 1226 by border patrol back in 2023.

THE COURT: Thank you. You may have a seat. Thank you.

I want to turn to the petitioner's First Amendment claim. Let's begin with the elements.

To establish a First Amendment retaliation claim, the petitioner must show he engaged in constitutionally protected activity, that he was subjected to an adverse action that would deter a person of ordinary firmness from continuing to engage in that activity, and that the protected activity was substantial or a motivating factor in the challenged action.

If Petitioner makes that showing, the burden shifts to the respondent to demonstrate by a preponderance of the

evidence that the same action would have been taken even if the petitioner did not file his lawsuit and seek discovery.

Counsel, give me your best theory of your First Amendment retaliation claim.

ATTORNEY McFADDEN: Yes, Your Honor, thank you.

As I'll describe, the retaliation claim arises because the status quo for almost three years was that our client was not on GPS, he was not on ISAP, and he was not required to check in. And that persisted for almost three years.

And then three times, Mr. Zapata Rivera took protected actions; and three times, ICE took almost immediate reactions that were adverse to Mr. Zapata Rivera, and that is unlawful.

The Government, I'll note, has not presented any evidence in this case. Certainly the facts are undisputed, and certainly no official from ICE has come forward at any time to say that there is a -- under oath -- to say that there is a non-retaliatory explanation for what they are doing to our client.

As the Court noted, one of the elements of a retaliation claim is a protected petitioning activity. I don't believe there's any dispute that that has occurred. And similarly, I don't believe there's any dispute that ICE did take adverse action.

The Government's argument here has been that Mr. Zapata Rivera cannot establish causation because his

initial release order in 2023 contained that GPS and Alternatives to Detention condition.

But there's several problems with the Government's argument on that point, and one is that, as I mentioned, the Government clearly abandoned those conditions almost immediately. Mr. Zapata Rivera checked in later in February of 2023, that same month; ICE did not actually apply GPS, ISAP, or require further check-ins, and that was the status quo for a long time.

And as the Court also noted earlier, I think it's legally doubtful that ICE could simply reactivate those conditions now absent any change in circumstance, and there has been no change in circumstance here.

Mr. Zapata Rivera has no criminal record, no criminal involvement of any kind. He has appeared for all immigration proceedings, and his next immigration hearing is not until 2028. And he has complied with all of the conditions of his release. There's no dispute about that, either.

And even if ICE, in the abstract, had some authority to reactivate these conditions, it's important to note that authority in the abstract, authority to act, is not a license to retaliate. And that is because of cases like the *McDonald* case. That was a prisoner case involving the authority to transfer prisoners from one facility to another.

And the First Circuit there said, yes, there is, in

the abstract authority to transfer a prisoner from one location to another, but you can't do that to retaliate. And that is surely what happened here.

The status quo, as of November 6, was none of these things. On November 6, Mr. Zapata Rivera had an encounter with an ICE agent. That agent used force on him, arrested him, and then released him at the scene. The Government does not contend that anything that happened during that encounter did or could justify any change in his conditions of release.

THE COURT: She did, however, indicate that an explanation regarding the enforcing of the conditions -- that a change of the presidential administration had an impact. And so do you want to respond to that?

ATTORNEY McFADDEN: Sure, Your Honor. First of all -- and I'll describe it -- The evidence clearly shows that's not what's going on here. This is clear retaliation.

But also, there's no declaration from ICE. There's no evidence from ICE that they're responding to any policy initiative of the new administration. And when this started to be done to Mr. Zapata Rivera, the new administration had been in place for almost a year. So I don't think that that is an explanation that makes any sense and it's certainly not supported by anything in the record.

What we know is that Mr. Zapata Rivera took the first protected act that we've identified at the very end of November

and beginning of December. So after he has this encounter in the beginning of November, for a month nothing happens. ICE does nothing to him, presumably because they don't think anything is justified.

But then at the end of November and beginning of December, Mr. Zapata Rivera, through counsel, sends a preservation request to ICE and to the marshals, asking them to preserve information about what had happened at the beginning of November.

And almost immediately, within a week, ICE sends Mr. Zapata Rivera a call-in letter demanding he report -- for the first time in almost three years -- for a check-in at ICE and that he bring his passport, which is clearly a very disturbing letter to receive when you're in his position.

The second thing that happened in terms of protected activity was that Mr. Zapata Rivera filed his lawsuit that's pending before this court, relating to the November 6 incident on December 15.

Three days later, he reports for his check-in, and now he's told it's not just one check-in but "we want to put you on GPS today."

His counsel objects and asks why, and counsel is told, "Well we think you might have violated your conditions, but also we don't know what your conditions are because we don't have the paperwork; so we're putting you on GPS."

Counsel objects, and they say, "Fine. We'll make you come in once a week for check-ins." And they do require Mr. Zapata Rivera to come in very frequently for these check-ins. He has to come in the day after Christmas when the Government is closed. He has to come in again in January and again in February.

And then the third protected act that Mr. Zapata Rivera took is serving the subpoenas that were authorized by this Court in the civil case.

This Court authorized him to serve subpoenas to take early discovery in the civil case and serve those subpoenas on the Department of Homeland Security and on the marshals and on an individual ICE agent, and he did do that at the beginning of February. February 3rd through 6 is when the initial service took place.

And when he reports for his check-in on February 11th, all of a sudden now it's not just frequent check-ins; now it is GPS and ISAP and they're sending him to the contractor who applies those things.

So every step of the way, they are ratcheting up retaliation as he takes further protected acts. He takes one act, he gets one check-in; he takes another act, he gets weekly check-ins. He takes a third act, now he's on GPS and the ISAP.

And that is a classic progression of retaliation which the case law indicates is sufficient to grant relief,

particularly in the presence of all of these factors which indicate irregularity in the way that ICE handled this.

So, for example, we know that ICE has given a series of shifting and false explanations. On December 18th it was because "we think you might have violated your conditions, although we don't even know what those are."

On February 11th, ICE said, "Well, we're going to leave it up to the contractor to decide if you're going to get GPS and ISAP.

And when they went to the contractor, the contractor said, "No, ICE ordered this." So it's abundantly clear that ICE has been providing explanations that are shifting and false.

Additionally, there has been a number of deviations from normal procedure. For example, weekly check-ins are not a normal condition, neither is coming in the day after Christmas when the Government is closed. Refusing counsel access to a supervisor at the ICE Burlington office is also not normal.

Certainly requesting social media is not normal, and posting geographic conditions with no written record is not normal. Claiming the contractor will decide what the conditions are -- also not normal.

There are just an abundance of these procedural departures on the part of ICE which is also circumstantial evidence of a retaliatory motive.

And lastly, I think there are statements that are indicative of animus towards our client.

The declaration of Attorney Araujo, which is in the record, she says that what they told her was, "We're trying to figure out if he violated his conditions, and we'll arrest him if he did." They didn't know what the conditions were. They didn't know the nature of any violation. They didn't know the severity of any violation, and yet they were already trying to come up with a way to arrest him at the beginning of December.

So that is a statement that at least indicates animus towards our client. And I think together all of these things combine to create a clear picture of retaliation against our client over a period of several months, a campaign of retaliation.

And the Government cites the *Pagan-Colon* case from the First Circuit, but that, of course, is a very similar situation. There is a temporal proximity between protected acts and adverse action. There is shifting explanations; there's false justifications and procedural deviations. And all of those things, the First Circuit said, can add up to a retaliatory picture.

And here I think it's particularly notable because the Government has not proven any evidence to the contrary. There's no showing coming back from the Government that there's any non-retaliatory motive for what they're doing to our

client.

And so for all those reasons, we think there is a clear picture of retaliation and relief is warranted.

THE COURT: I do have a final question for you before I speak to the Government.

As far as you know, did the petitioner receive significant social media attention after the filing of his lawsuit or related to any of the events precipitating his lawsuit?

ATTORNEY McFADDEN: I'm sorry, Your Honor. Do you mean engagement with his own social media accounts?

THE COURT: Yes. Well -- sometimes -- what do they call it? Going viral? I'm too old to have anything I say go viral, but I do note that that could be -- sometimes that happens, that causes a sort of ripple effect.

Are you aware of something either related to the incident in which he alleges injury, anything of the participation since -- with ICE since then?

ATTORNEY McFADDEN: So I think, as far as I'm aware, Your Honor, the things that have gone viral, it's not our client's own social media accounts, it was news about the November 6 incident and then later the lawsuit.

The November 6 incident was recorded by bystanders. One of them posted it to a different social media account, and my understanding is that is the video that ultimately did go

viral in terms of what happened to our client. It shows him being strangled unconscious and having very pronounced, involuntary seizure-like movements.

I think the other thing that has happened is that there was coverage of the initial filing of his lawsuit against the unknown ICE agent. In the amicus brief from the Attorney General's office, they actually cite some of the articles that covered that as well.

THE COURT: Thank you.

Counsel, you know, waiting three years -- and I understand that a new administration can have different prerogatives, and as they should; they have that right to do so. But we're talking here about constitutional principles which don't generally change from one administration to another.

Why would -- three years, after such a period of time -- the petitioner be suddenly subjected to these enhanced conditions?

ATTORNEY O'CONNOR: Well, Your Honor, I think the most logical explanation is he was not on their radar even until this November encounter.

And I think that the relevant time period is really not how much time expired between 2023 and when he was ultimately given these conditions in 2026, but when he engaged in his protected conduct, and here that's in November. And

then we have three months go by before GPS conditions are ever imposed.

And I think what's important to point out and what Petitioner doesn't seem to acknowledge, is that he was never detained by ICE. So he was never treated as a mandatory detainee under 1225(b)(2), which I'm sure, as Your Honor is aware, the vast majority of folks are detained and treated as a mandatory detainee. Petitioner here was never even detained.

So there's been no ratcheting up of custody. If anything, there's ratcheting down, because he's not getting even the level of detention that the vast majority of detainees in similar situations with are facing.

THE COURT: The enhanced conditions, they are potentially onerous, and they do enter into areas that for the last three years he was not required to divulge his daily movements -- where he goes, the things that he does. What would they serve -- what purpose would they serve now, that were underserved three years prior?

ATTORNEY O'CONNOR: I think I would take issue, Your Honor, with the phrasing of "enhanced conditions" because these aren't enhanced conditions. These are always the conditions that were imposed lawfully under 1226 when he was released on recognizance. These were always the conditions of his release.

Yes, they weren't enforced, but there's been no enhancement of his conditions of release here. These have been

the same since 2023. They are now being enforced under very -- under the very logical explanation that this administration is enforcing a lot of the immigration laws more readily.

And I think that's the most logical explanation of what happened here, and I think the petitioner has a hard time making this causal link when he's engaging in this protected conduct since November, nothing happens until February, and the only thing that happens is that he is given the conditions that were always imposed as condition of his release since 2023.

THE COURT: Are you aware of any internal memorandum or documentation regarding the decision to start to utilize -- I won't say new conditions -- start to utilize the tools that -- including the GPS and enhanced or additional reporting requirements and -- or any internal memorandum or documentation regarding the petitioner's immigration proceedings? Are you aware of any documentation regarding that?

ATTORNEY O'CONNOR: I am not aware of any documentation, Your Honor, only my own personal experience in seeing the number of increased GPS monitoring situations.

THE COURT: And who do you believe made the ultimate decision to institute the imposition of these conditions at this time?

ATTORNEY O'CONNOR: I don't know who officially imposed it in 2026, Your Honor, but it appears to have been the immigration officials. But I don't know who specifically, Your

Honor.

THE COURT: And are you aware of any efforts right now -- official efforts that are being made -- to actually bring the petitioner into physical custody at this time?

ATTORNEY O'CONNOR: I am not aware of that, Your Honor.

THE COURT: All right. Thank you very much.

Any final -- before I make some remarks?

ATTORNEY McFADDEN: Your Honor, if I may just briefly address the request for relief.

You know, we think this is particularly concerning that our client has been targeted for this form of retaliation, particularly because he has a pending case before this Court and this retaliatory conduct all relates to that case in different ways at different times.

It's also very concerning because people like him are extremely vulnerable to retaliation. He's in an immigration proceeding; his status is currently uncertain, and it's very easy for the Government to retaliate against him.

And certainly it could not only have a deterrent effect on him but on many people who are trying to potentially bring claims. And also, retaliation could prevent Government misconduct from being exposed and accountability for that type of misconduct. So we think it's just very important that here his right to petition be protected.

We have asked that he be released from GPS, from ISAP and from these check-ins.

And further, we have suggested that the Court may wish to consider retaining jurisdiction given that he's in an ongoing civil case and will be taking further protected acts as that civil case progresses.

The Court may wish to retain jurisdiction in order that further actions against our client would require some form of prior judicial approval based on some demonstration of a change circumstance that is not a protected act.

THE COURT: All right. Thank you.

Anything further on behalf of the Government?

ATTORNEY O'CONNOR: No, Your Honor, thank you.

THE COURT: Thank you very much.

So let me start by saying that the allegations made by the petitioner are very serious. He contends that the federal immigration officials imposed onerous conditions in retaliation for his having filed suit arising out of a November 6 incident and for seeking discovery in this matter.

If proven, such conduct could raise substantial First Amendment concerns. The right to petition the Government for redress of grievances is protected, and Government action taken in retaliation for the exercise of that right is impermissible. I think we can all agree on that.

The Court is mindful that causation is central here.

Ultimately, the petitioner must establish that the alleged retaliatory move was a but-for cause of imposing the challenge conditions. At this stage, however, the question is whether the record permits the Court to resolve that issue. On the present record, it does not.

The Court also recognizes that the Department of Homeland Security and its components perform critical law enforcement and national security functions and that their determinations are entitled to appropriate consideration.

At the same time, the Court cannot assess the legitimacy of the asserted reasons for the challenged conditions without an adequate evidentiary record.

That leads to what the Court views as the central issue of this petition: How respondents intend to meet their burden of demonstrating that the challenged conditions would have been imposed in the manner they were imposed, irrespective of Petitioner's protected activity. As I understand it, the imposition of these conditions involved one or more decision-makers.

I believe an evidentiary hearing is necessary to hear from decision-makers regarding the basis for their decisions and to permit appropriate examination of whether legitimate, non-retaliatory reasons support the timing and nature of the conditions imposed.

Therefore, I'm going to retain jurisdiction over this

matter while we further ascertain the facts.

I'm not going to order administrative exhaustion at this time because I believe Petitioner has demonstrated that an exception to the common law exhaustion applies because he's challenging an ongoing deprivation of a constitutional interest which is an exception recognize *Brito v. Garland*.

Next, I'm going to order an evidentiary hearing. I believe that Petitioner has plausibly alleged a potential First Amendment retaliation violation; however, further factual development is required on the motivation prong for his claim.

In reviewing relevant case law, many of the other cases alleging similar claims include information, internal decisions that ICE made in taking action, such as a decision to suddenly revoke one petitioner's visa in one case.

So I will allow Petitioner the benefit of an evidentiary hearing. The questions must be narrowly tailored to the circumstances around the imposition of the enhanced conditions. I would also like more information about the original conditions that were imposed.

Second, I will also hear the parties as to whether they believe some limited discovery is warranted. And let me finish by stating my order for now, and we'll turn to that.

If there is no evidence of retaliation that is uncovered through the evidentiary hearing, the next avenue for relief may be for Petitioner to seek amelioration of these

conditions before an immigration judge.

In the meantime, I implore the parties to maintain the status quo. I'm going to order now that if Petitioner is arrested, Petitioner shall not be transferred outside of the District of Massachusetts and shall not be removed from the United States. Further, if there is relevant evidence in any party's possession, it must be preserved.

I will now hear you on the scope of the evidentiary hearing and whether limited discovery should be allowed. Do you want a few minutes to think about this and to discuss or --

ATTORNEY McFADDEN: I think we can move forward at this point, Your Honor.

Your Honor, I think, first of all, it would be important for us to receive any internal records or correspondence relating to the decisions about our client that were made starting at the end of November or beginning of December. So I think we could fashion document requests that would allow us to receive information within that scope.

I think beyond that, we may have other document requests which, after we have a few minutes to confer, we may be able to come up with, but I think largely it would be documents relating to those decisions that have taken place over the last several months.

Beyond that, I think for an evidentiary hearing, the witness list for such a hearing may be informed by the content

of those documents.

But certainly we would want any decision-makers who were involved in these various decisions over time and anyone who participated in those communications to potentially be a witness in the hearing so we can ascertain, with reference to the documents they created at the time, what their motivations and explanations are for what has occurred.

THE COURT: Any thoughts, Counsel?

ATTORNEY O'CONNOR: Given Your Honor's order, I think that Petitioner's proposed discovery sounds reasonable.

THE COURT: We need to decide whether or not we're going to have live witnesses, whether or not there's going to be documents. Shall we get a status on this?

(The Court confers with her staff.)

THE COURT: Is a week enough to go through your thoughts regarding what discovery you'll need and when we'll be able to have a hearing?

ATTORNEY McFADDEN: Yes, Your Honor. I think so.

THE COURT: So let's give a filing date a week from today. We can probably do that by Zoom, the status. So Friday the 27th. So if you have something you want to submit, file it by Thursday and then we'll have a Zoom on Friday.

THE CLERK: Judge, we can do Friday at 2:00 p.m. by Zoom. That's the 27th.

ATTORNEY O'CONNOR: Just for my clarification -- next

Friday would be status, and then there would be a further date?

THE COURT: Yes. We'll have to talk about a date and if there's going to be live witnesses, et cetera.

(The Court confers with her staff.)

THE CLERK: Okay. Change to noon. Noon on the 27th.

THE COURT: All right. Thank you very much. I appreciate all of your appearance.

(Whereupon the hearing concluded.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jessica Leonard, Certified Shorthand Reporter and Federal Certified Realtime Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 23rd day of March, 2026.

/s/ Jessica M. Leonard

Jessica M. Leonard, CSR, FCRR

Official Court Reporter